# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH PAUL SIMCOX, | ) | CASE NO.1:07CV96 |
| | ) | |
| Petitioner, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| Vs. | ) | |
| | ) | |
| CLAIRE M. SIMCOX, | ) | OPINION AND ORDER |
| | ) | |
| Respondent. | ) | |

## CHRISTOPHER A. BOYKO, J:

On January 12, 2007, Petitioner Joseph Simcox, filed a Verified Petition for Return of Children Under the Hague Convention and for Immediate Issuance of Temporary Restraining Order to Respondent in this Court. Petitioner seeks the return of four of his five children, allegedly wrongfully abducted by his estranged wife, Claire Simcox, from Mexico to the United States. Petitioner contends Mexico was the place of the family's habitual residence immediately preceding the abduction. Pursuant to the Hague Convention, custody of the children is appropriately determined by the courts of the nation of habitual residence.

For the following reasons, this Court grants, in part, and denies, in part, Petitioner's Petition. The Court Orders the return of DS and SS to Mexico but will not order the return of PS and CS.

## PROCEDURAL BACKGROUND

Petitioner filed his Verified Complaint with this Court on January 12, 2007. The Court scheduled a hearing for January 18, 2007, on Petitioner's Motion for Temporary Restraining

1

Order. On January 18, 2007, the parties reached agreement on the injunctive relief claim and the Court entered the agreed upon order submitted by the parties. The Court scheduled an evidentiary hearing for February 2, 2007. On January 29, 2007, the Court conducted a telephone conference with counsel for both parties. As a result of the parties need for additional discovery, the Court set a trial date of February 26, 2007, and adopted the proposed discovery dates the parties submitted in their Fed. R. Civ. P. 26 Report of Parties Planning Meeting. The Court conducted a bench trial on the claims asserted in Petitioner's Verified Complaint beginning February 26, 2007. The Court heard testimony and considered evidence submitted by parties, including interviews with the eldest three children who are the subject of Petitioner's Verified Complaint and an interview with the eldest child currently residing with Petitioner and not subject to the Verified Complaint. The bench trial concluded March 1, 2007. By agreement of the parties, Findings of Fact and Conclusions of Law were submitted to the Court twenty-eight days after the trial transcripts were filed. The parties requested, and the Court agreed, to bifurcate claims for costs and fees, reserving hearing testimony and taking evidence on costs until the Court has ruled on the merits of Petitioner's claims.

## FACTUAL BACKGROUND

Claire and Joseph Simcox were married in London, England on December 16, 1991. Both Claire and Joseph are United States citizens. They have five children: AS, age 14, born in France, PS, age 12, born in Italy, CS, age 10, born in Ethiopia, DS, age 8, born in Greece, and SS, age 4, born in Mexico. The family has traveled extensively due to the nature of Petitioner's profession. Even when they established roots in a particular community the family would travel for extended periods of time. The family resided in Mexico from 2002, at the earliest, to 2004, at

the latest, until Claire removed the four youngest children to the United States on or about January 30, 2006.

At trial, Petitioner testified arguments between he and his estranged wife would often get physical. Claire Simcox testified to years of abuse, both physical and emotional, of herself and the children at the hands of Joseph Simcox. There is no clear picture from the testimony of all the family members, including the children, of what life was like in the Simcox household prior to the alleged wrongful abduction. Clearly, corporal punishment, including spanking, hair pulling and use of a belt, was not uncommon. Furthermore, the testimony revealed arguments between Joseph and Claire would sometimes become physically violent. Joseph Simcox even admitted to shoving his mother which he referred to as "Polish hollering". In the Court's interviews with PS, CS and DS, each unequivocally expressed a desire to remain in the United States and expressed fear of their father.

## STANDARD OF REVIEW

This Petition is brought pursuant to the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §11601 *et seq.*, and the Hague Convention on Civil Aspects of International Child Abduction ("Hague Convention"). Both the United States and Mexico are signatories to the Hague Convention. The stated purpose of Article One of the Hague Convention is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and " to ensure the rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States."

This Court has jurisdiction over the allegations contained in Petitioner's Verified Petition pursuant to 42 U.S.C. 11603(a) and (b). This Court's jurisdiction extends to a determination of

3

the merits of the abduction claim but does not extend to a determination of "the merits of the underlying custody dispute." *Friedrich v. Friedrich,* 78 F.3d 1060, 1063 (6th Cir. 1996);[1] Hague Convention, Art 19; 42 U.S.C. §11601(b)(4). The Sixth Circuit further noted, "the Hague Convention is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich II* at 1064, citing Pub. Notice 957, 51 Fed. Reg. 10494, 10505 (1986).

The party seeking return has the initial burden of demonstrating, by a preponderance of the evidence, the habitual residence of the child and the person in the country of habitual residence is or would otherwise be exercising custody rights over the children under the laws of the country of habitual residence at the time of the alleged wrongful abduction. See 42 U.S.C. §11603(e)(1)(A and B). The respondent then has certain defenses under Art. 12, 13 or 20 of the Hague Convention.

Under Article 12 of the Hague Convention, if the Petition for Return is not filed within one year after the alleged wrongful abduction of the child, the Court may consider whether the child is well-settled in its new residence. The parties do not dispute Petitioner filed his Petition within one year from the date of the alleged abduction.

Under Art. 13 of the Hague Convention, Respondent may assert the following defenses:

a) the parent seeking removal did not actually exercise custodial rights or consented

---

[1] The Sixth Circuit has rendered two opinions in *Friedrich v. Friedrich.* The first *Friedrich* opinion was issued in January of 1993 at 983 F.2d 1396. For purposes of clarity, the Court will refer to this case as "*Friedrich I*". The second *Friedrich* opinion, dated 1996 and cited above, will be referred to as "*Friedrich II*".

    to the removal. This must be proved by a preponderance of evidence. See 42 U.S.C. §11603(e)(2)(B).

b) there is a grave risk of physical or psychological harm to the child if returned or return would place the child in an intolerable situation. This must be proved by clear and convincing evidence. See 42 U.S.C. §11603(e)(2)(A).

c) the Court may also refuse to return the child if, by a preponderance of the evidence, the child objects to return and the Court finds the child to be of sufficient age and maturity in which it is appropriate to consider the child's views.

Finally, under Art. 20 of the Hague Convention, the Court may refuse to return the child where fundamental principles of human rights and freedoms weigh against return. This requires clear and convincing evidence. See 42 U.S.C. §11603(e)(2)(A).

## ANALYSIS

### A. Exercise of Custody Rights

The parties do not contest, Petitioner had, and was exercising, lawful custody over the children pursuant to Mexican law. The Court heard uncontested testimony by a former Mexican Judge that Mexican law confers custody to both parents of their children who reside with them.

### B. Timeliness of Filing Verified Petition for Return Pursuant to ICARA

The Court finds Petitioner filed his Petition within the one-year period set forth in Article 12 of the Hague Convention.

### C. Habitual Residence

Pursuant to the Hague Convention and 42 U.S.C. § 11603(e)(1)(A), wrongful removal occurs when the child is removed, in violation of the rights of custody, from the state in which

the child was "habitually resident," and, at the time of removal, those rights must have been actually exercised. *In re Prevot,* 59 F.3d 556 (6th Cir. 1995) citing Hague Convention, Art. 3. "The term "habitual resident" is not defined in ICARA or the Hague Convention. As a consequence, the facts and circumstances of each case must be assessed." *In re Prevot,* 59 F.3d 556 (6th Cir. 1995) citing *Friedrich v. Friedrich,* 983 F.2d 1396, 1401 (6th Cir.1993). "The intent is for the concept [habitual residence] to remain fluid and fact based, without becoming rigid." *Levesque v. Levesque,* 816 F.Supp. 662, 666 (D.Kan.1993).

The Sixth Circuit has held, when determining habitual residence, courts must "focus on the child, not the parents, and examine past experience, not future intentions." *Friedrich I* at 1401. The *Friedrich I* Court, quoting the British High Court of Justice stated, "there is no real distinction between ordinary residence and habitual residence." *Id.* "A person can only have one habitual residence. On its face, habitual residence pertains to customary residence prior to removal. The Court must look back in time, not forward." *Id.*

Respondent contends Petitioner has not met his burden of demonstrating habitual residence in Mexico. Respondent testified her family lived a nomadic lifestyle, and the family's five children were each born in a different country. The family traveled extensively due to Petitioner's profession as a botanical explorer. As best as this Court can surmise, Petitioner researched, located, gathered and sold exotic plant seeds to nurseries. The children worked with their parents in the botanical explorer business, often going along with Joseph on extended trips to remote places to gather the seeds. The children were home schooled.

Respondent further contends Petitioner maintained his business address, vehicle registrations and bank accounts in the United States. They were not a member of any parish or

6

church and the children did not receive regular medical or dental care while the family lived in Mexico. She further alleges she was coerced into staying in Rafael Delgado, Mexico and never intended to make Mexico her place of habitual residence.

Petitioner offered evidence Respondent signed a one-year lease for real property in Rafael Delgado, Mexico in April 2005. Petitioner introduced evidence of a prior lease of a house in San Miguel de Allende, Mexico in June of 2002. Respondent also obtained a Mexican visitors visa permitting her to stay in Mexico for one year in August of 2004. The office of the Mayor of Rafael Delgado, Mexico issued a notice and certification in May of 2006, stating Petitioner has been domiciled in Rafael Delgado since May of 2003. Petitioner introduced receipts of property improvements to leased real property in Mexico. Petitioner produced a letter from Respondent to relatives, discussing how she had obtained a "residency visa this week, it is valid for one year" in Mexico in August of 2004. Petitioner introduced evidence of utility bills, frequent withdrawals on accounts in Mexican banks, membership cards in both Petitioner's and Respondent's names to various stores in Mexico, predating Respondent's alleged wrongful abduction of the children in January 2006. Petitioner's youngest child was born in Mexico in 2002, has dual United States and Mexican citizenship and has real property listed in her name in San Antonio, Nanahuatipan, Oaxaca, Mexico, on a deed dated September 2004. Finally, Respondent's own testimony acknowledges she was a resident of Mexico since 2004 (TR pp. 279-280), contravening her sworn testimony to the Lorain County Domestic Relations Court that she had only been living in Mexico for one month prior to the time she removed the children to the United States. While Respondent's testimony on the stand attempted to draw a distinction between her residency in Mexico, as opposed to the children's residency in Mexico, the Court finds the evidence

demonstrated the children resided with their parents wherever the family resided, with the exception of limited interludes to visit relatives. Thus, the parents place of habitual residence-i.e. Mexico- was also the children's place of habitual residency.

Therefore, the Court finds Petitioner has met his burden and proven by a preponderance of the evidence the family's place of habitual residence at the time of the alleged wrongful abduction was Mexico. Having demonstrated his custodial rights under Mexican law, his exercise of custodial rights in caring for, supporting and residing with his children and demonstrating Mexico was the place of habitual residence, Petitioner has proven Respondent's removal of the children from Mexico was wrongful under the Hague Convention.

The burden now shifts to Respondent to prove one of the defenses permitted under the Hague Convention and 42 U.S.C. §11603.

## D. Childrens' Objection to Return

Article 13 of the Hague Convention authorizes the Court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." On March 1, 2007, the Court conducted interviews, in chambers, with three of the four children at issue, PS, CS and DS. The Court finds DS, age 8, is not of sufficient age and maturity to permit this Court to appropriately consider his views. Though he expressed his objections to return, the Court found DS preoccupied, disinterested and detached; in short, a typical eight year old boy who strongly desired to be anywhere but in a Judge's chambers answering questions. However, his behavior did, to a material degree, indicate avoidance in discussing his father. He was visibly uncomfortable dealing with memories of Mexico. Based on the Court's *in camera* interviews

8

with PS, age 12, and CS, age 10, the Court finds these children possessed the requisite level of age and maturity sufficient for this Court to consider their views. See *Giampaolo v. Erneta,* 390 F.Supp.2d 1269 (N.D.Ga.2004) (10 year old found to be of sufficient age and maturity); *Anderson v. Acree,* 250 F. Supp.2d 876, 883-884 (S.D. Ohio 2002)( 8 year old found to be of sufficient age and maturity); *Blondin v. Dubois,* 238 F.3d 153, 164 (2d Cir. 2001)( 8 year old found to be of sufficient age and maturity).

Both children unequivocally stated their objections to return to Mexico. CS became visibly upset when asked about return to her father. PS, who suffered the brunt of his father's anger according to several witnesses, remained calm and quiet but clearly was concerned with, and objected to, return to Mexico. Both children described punishment at the hands of their father, and witnessed their father pull their mother's hair and hit her. PS stated Petitioner would punish them every day. He expressed fear of his father. He further described their life in Mexico as difficult, due to the daily labor working in the family's seed business. He also expressed a fear of being separated from his mother and siblings.

CS stated her days in Mexico were filled primarily with working in the family garden/field, weeding and picking up rocks, sorting and planting seeds. She witnessed her father grab her mother by the neck and recalled her father threatening to take the children away and leave them on the road. She fears her father because "he is big and mean" and she witnessed repeated instances of her father hitting her brothers. She testified AS, the eldest child currently residing with her father, was not treated as harshly because she worked in the house with Respondent, doing cooking and cleaning, while CS and her brothers worked in the field/garden with Petitioner. She stated her objections to returning to Mexico. Based on their testimony, the

9

Court will not order the return of PS and CS.

The Court found troubling Petitioner's attitude, behavior and conduct during the course of these proceedings. The Court first found problematic Petitioner's deposition testimony which can only be described as unresponsive, obnoxious, intentionally obtuse and arrogant. His own counsel had to repeatedly admonish Petitioner to stop being argumentative. Based on Petitioner's evasive and oftentimes insulting responses to questions at the deposition, the Court instructed Petitioner on the stand, prior to his testifying, to refrain from such behavior. At one point during trial, Petitioner became belligerent with Respondent's counsel, necessitating an immediate and pointed reminder from the Court that such behavior would not be tolerated. His failure to follow repeated instructions by Court and counsel to answer only the questions put him by counsel and to refrain from speaking quickly and monologuing on simple yes and no questions ultimately resulted in one court reporter's exasperation, requiring the Court replace the court reporter. Furthermore, this Court was made aware of an altercation between Petitioner and another member of Respondent's family in the hall outside the courtroom.

While this Court is not unmindful or unsympathetic to Petitioner's plight and his feelings of desperation and frustration in not seeing his children in over a year, his in-court behavior exhibits an arrogance, a need to be in control and a tendency to act out violently that presents serious concerns such traits have been amplified outside the confines of the courthouse. When coupled with testimony from Petitioner's own family and friends describing him as "mean," and one friend comparing Joseph's control over his wife with the Nazi's treatment of Jews; "Jews had more freedom in Nazi Germany than with you" and Petitioner's own desire not to be remembered as "a mean and overworking hollering bastard," this Court has serious concerns

10

Petitioner does indeed present a serious threat to his children's physical and psychological well-being. There is also testimony that Respondent has used severe methods of discipline with the children. AS testified witnessing her mother beat her brother PS on the back with her fists. In light of this testimony, the Court has some concern for the children's overall health while in their mother's care.

### E. Grave Risk

The Court's analysis of the exception to return under Art. 13(b) will be limited to DS and SS, since the Court has determined it will not order return of PS and CS due to their objections. Once again turning to *Friedrich II*, the Sixth Circuit defined "grave risk" as follows:

> we believe that a grave risk of harm for the purposes of the Convention can exist in only two situations. First, there is a grave risk of harm when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute- *e.g.,* returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Friedrich II* at 1069. Respondent must prove grave risk by clear and convincing evidence. *Federal Jury Practice and Instructions, Part V, General Instructions for Civil Cases,* §104.2 defines clear and convincing as "evidence that produces in your mind a firm belief or conviction as to the matter at issue."

There has been no evidence presented suggesting returning the children to Petitioner would place them in a zone of war, would expose them to famine or place them in imminent danger of disease. There has been no testimony any of these dangerous conditions motivated Respondent to remove the children from Mexico.

11

In considering the second situation contemplated by the Sixth Circuit in interpreting the Hague Convention, Respondent has provided evidence of a *serious* risk of harm due to abuse and emotional dependence. This Court may only consider that evidence "directly establishing the existence of a *grave* risk that would expose the child to physical or emotional harm or otherwise place the child in an *intolerable* situation". *Friedrich II* at 1068 (italics added). "The person opposing the child's return must show that the risk to the child is grave, not merely serious." *Id.*

In considering the grave risk to DS if returned, the Court has found DS's age and maturity insufficient on its own to refuse return. However, his testimony and demeanor, when coupled with the expert testimony in this case, is pertinent. Respondent's expert opined DS rated very high in post-traumatic stress syndrome. She discussed his habit of fleeing when people come to the door. She concluded returning DS to his father would be traumatic due to the abuse suffered at the hands of his father and his having witnessed the abuse his father inflicted on his mother. Finally, her report concluded DS is very emotionally bonded to his siblings and separating them would cause grave risk of harm. Respondent's expert's opinions were not directly contradicted by Petitioner's expert. While Petitioner's expert raised concerns over the methodologies used by Respondent's expert, Petitioner's expert never interviewed the children or parents and was unable to reach conclusions based on the same level of information and interaction.

The Court also has serious concerns over the validity of Respondent's expert conclusions. First, the expert failed to disclose conversations with Daniel Wepplo and Claire Simcox's sister in conjunction with her analysis of the children and Claire, until shortly before trial. Daniel Wepplo was a family friend who Petitioner believes has been having an affair with his wife and was the primary reason for her flight to the United States. Furthermore, she admitted her reports

12

on the children were not complete.

In any event, the expert's conclusions on the risk of separating the children from their mother or siblings is not dispositive. "The only other circuit addressing the issue had its own doubts about whether a psychological report concerning the difficulty that a child would face when separated from the abducting parent is ever relevant to a Hague Convention action. *Nunez-Escudero,* 58 F.3d at 378 (such reports are not per se irrelevant, but they are rarely dispositive)." Friedrich II at 1069.

This Court finds Respondent has not proven by clear and convincing evidence a grave risk of harm to DS if returned. Return will very likely be upsetting and difficult for DS, however, this Court was not presented with clear and convincing evidence the Mexican system cannot provide protection if there is abuse. In fact, other courts have found the Mexican system provides the requisite protection for the children. "If return to a country, or to the custody of a parent in that country, is dangerous, we can expect that country's courts to respond accordingly. *Cf. Nunez-Escudero v. Tice-Menley,* 58 F.3d 374, 377 (8th Cir.1995) (if parent in Mexico is abusive, infant returned to Mexico for custody determination can be institutionalized during pendency of custody proceedings)." *Friedrich II* at 1069. The Court heard testimony from a former Mexican Judge, a Mexican attorney and a consultant/advocate specializing in domestic and sexual violence in Mexico. They gave conflicting testimony on the protections afforded women and children subject to domestic violence in Mexico. While all agreed a new law recently passed in Mexico represents a dramatic leap forward in the protection of women and children, it has not been ratified by the individual states and is unenforceable at present. The former Mexican Judge testified, in the absence of bribes, it is difficult to get protection from

13

police for abused women due to the machismo culture in Mexico. However, the Mexican attorney testified it is his experience as an attorney practicing in the area of family law that orders of protection can be obtained within two days and the police take the orders seriously and enforce them. Therefore, the Court finds Respondent has failed to prove by clear and convincing evidence the Mexican Courts are unable or incapable of protecting the children if returned and the Court finds Respondent has not proven a grave risk of harm to DS if returned.

      Finally, the Court was presented with less information on which to make a determination on SS. Being the youngest child at approximately four years of age, SS was not of sufficient age and maturity for this Court to consider interviewing her. Respondent's expert did not engage in an analysis of SS similar to the older children due to her young age, inability to communicate sufficiently to make certain determinations, and lack of memory of Mexico. Respondent's expert stated SS, while normally developing, becomes fearful and hides when strangers come to the door. The expert further concluded, based on her observations, SS is strongly bonded to her mother and siblings and while she did not experience the abuse suffered by the mother and older children, removing her from her mother and siblings would be harmful and would place her at grave risk of psychological harm and would place her at serious risk of abuse. However, Petitioner's sister testified she went to visit the children shortly after they were abducted. When she arrived at their residence in Ohio, the adults herded the children upstairs when they saw Petitioner's sister through the window. This account gives the Court an alternative explanation why the children hide when unknown adults come to their house. Because there is no evidence of grave risk of harm to SS, this Court finds SS must return to Mexico for determination of custody by the Mexican Courts.

14

While ordering the children's return will surely cause further disruption in their lives, the Sixth Circuit has admonished parties "it is the *abduction* that causes the pangs of subsequent return. The disruption of the usual sense of attachment that arises during most long stays in a single place with a single parent should not be a "grave" risk of harm for the purposes of the Convention." *Friedrich II* at 1068.

The Court was presented with credible evidence Claire Simcox left Mexico and her husband because she was involved with another man, Daniel Wepplo, who had been living with the Simcox family in Mexico and helped in the family business. AS testified to finding her mother in a compromising position with this man in the family house in Mexico. The Court had evidence Claire and Daniel intended to start a business together in Minnesota shortly before Claire left with the children. All parties admit Joseph asked Daniel to leave the family home approximately one month before Claire abducted the children, due to his concerns over Daniel's relationship with Claire. Claire admitted at trial to a continuing relationship with Daniel.

The Court was also presented with evidence Claire had opportunities to leave Joseph prior to the ousting of Daniel from the family home and she did not take advantage of them. Joseph traveled to Alaska for several months, leaving Claire and the children alone. She traveled to the United States during that time. Just weeks before the abduction, Claire left all the children in Joseph's care while she visited family in Ohio. Finally, Respondent's cold indifference to her daughter AS's custody is inconsistent with her efforts to portray herself as a mother concerned only with the safety and welfare of her children. All this supports Petitioner's claim that Respondent's true motive for abducting the children was her desire to be with Daniel Wepplo and not fear of Petitioner.

### F. Witness Credibility

What presented the most difficulty in this matter was the lack of credibility of both Petitioner and Respondent. While there were some consistencies in their stories there were disparities so broad this Court can only speculate on the truth. For example, Respondent told a story of a time the family resided in Oaxaca where Petitioner, without authorization, accessed the village's water supply. The picture she paints of the villagers' response conjures images of a mob in a Frankenstein movie converging on the Simcox household with machetes in place of torches and pitchforks, hell bent on punishing Petitioner. Petitioner not only denies such an incident took place but stated he was "super popular" in Oaxaca. However, Petitioner's own witness confirmed that villagers arrived at the house carrying machetes in response to Petitioner's actions while in their town. Respondent alleges the police in Mexico would often show up unannounced at the house in the early morning hours seeking bribes. Petitioner denies this and instead suggested payment to the police was merely a courtesy much like tipping a waitress at a restaurant.

Respondent's testimony was unbelievable in her recounting the lack of funds available to her during her time in Mexico, which was contravened by the family's banking records. Also, she has been less than forthright in her answers to the question of the family's residency in Mexico for years prior to her taking the children to the United States. Respondent's apparent lack of concern for the grief and pain her actions have caused the eldest daughter AS in preventing her reunion with her siblings was also troubling to this Court. The Court fervently hopes the parents put aside their bitterness and anger and work together for a resolution that is best for all the children.

16

### G. Consent or Acquiescence to Removal

Respondent contends Petitioner acquiesced or consented to the removal of the children when he offered to bring the children to the United States to be with Respondent and provide payment to Respondent for support of the children. However, the Sixth Circuit in *Friedrich II* found the abducting parent's "deliberately secretive nature" in the abduction was strong evidence that the non-abducting parent did not consent. *Friedrich II*, at 1069. At trial, Respondent testified she left with the children at midnight while Petitioner was sleeping. Petitioner described his desperate search for the children and testified Respondent took his passport and identification papers to prevent his pursuit of the fleeing family. Neither party acted consistent with the understanding Petitioner consented to removal of the children. Therefore, the Court finds Petitioner did not consent, pre-abduction, to the removal of the children.

The Court further finds Petitioner did not subsequently acquiesce to the removal of the children. The mere fact that Petitioner offered to bring the eldest child to Ohio and provide financial support was clearly made in the context of trying to negotiate an arrangement satisfactory to all sides. Furthermore, the Sixth Circuit in *Friedrich II* held, " we believe that acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich II* at 1070. There is no testimony in this proceeding evidencing Petitioner's renunciation, nor do the emails cited by Respondent present a convincing renunciation. Finally, the custody cases in Mexico and the United States do not support a consistent attitude of acquiescence. Rather, Petitioner has demonstrated a dogged determination to reunite with his children and have them returned to

17

Mexico. Therefore, the Court finds no consent or acquiescence.

### H. The Children are Well-Settled

The Court need not consider Respondent's arguments that the children are well-settled in their new environment and removal would result in either grave risk of harm or place them in an intolerable situation. Under the Hague Convention Art. 12, the consideration of whether a child is well-settled in its new environment is only considered when Petitioner files outside the one year filing period. Here, Petitioner filed his Petition for Return within the one-year filing period. Also, the Sixth Circuit has stated, "[a] removing parent must not be allowed to abduct a child and then-when brought to court-complain that the child has grown used to the surroundings to which they were abducted." *Friedrich II* at 1068.

### I. Fundamental Principles of Human Rights and Freedoms

Respondent has not argued nor offered evidence that ordering the return of the children to Mexico would be in opposition to fundamental principles of human rights and freedoms.

### CONCLUSION

This Court cannot engage in a best interest analysis but rather must effectuate the purpose of the Hague Convention. Ultimately, the Sixth Circuit has held, " a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." *Friedrich II* at 1067. Therefore, in light of all the evidence, the Court finds the children in question were wrongfully abducted by Respondent in contravention of the stated purposes of the Hague Convention. However, the Court will not order the return of PS and CS as they have clearly expressed a desire to remain in the United States and the Court has found them to be of sufficient age and maturity. The Court further finds

Respondent has not met her burden of demonstrating a valid defense to the return of DS and SS and the Court orders their return to Mexico for determination of custody by the Mexican courts. However, due to this Court's concerns over the children's safety, the Court Orders return under the following conditions: pursuant to Petitioner's offer to vacate the family home in San Rafael, the Court Orders DS and SS returned to Mexico but must remain in the custody of Respondent in the family's residence in Rafael Del Gado, Mexico until the Mexican Court hears and determines whether a protective order is appropriate. Petitioner shall have no contact with Respondent until the Mexican Court determines access and visitation rights. Upon return to Mexico, Respondent shall provide AS reasonable access to her siblings. The Court Orders SS and DS returned to Mexico no later than July 30, 2007. The Court has determined a thirty day period will permit Respondent sufficient time to appeal and allow the Sixth Circuit time to decide whether it will stay return and permit Petitioner time to vacate the family residence in Rafael Del Gado.

Because this opinion is pursuant to this Court's authority under federal law and an international treaty, Court finds this Order supercedes any conflicting state court determinations. Petitioner shall submit his brief and supporting materials on costs no later than July 30, 2007. Respondent shall file her brief in opposition no later than August 14, 2007. The Court will determine if a hearing is required after reviewing the briefs.

IT IS SO ORDERED.

_6/29/07_
Date

*Christopher A Boyko*
CHRISTOPHER A. BOYKO
United States District Judge

Not for publication